**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

JUSTIN DWANE HELMUTH,

      Plaintiff,

v.
                                    Case No. 8:25-cv-722-KKM-CPT

UNITED STATES CITIZENSHIP
AND IMMIGRATION SERVICES,

      Defendant.

_____

## ORDER

Justin Helmuth challenges the United States Citizenship and Immigration Services' (USCIS) decision denying his I-600 Petition to Classify Orphan as an Immediate Relative as arbitrary and capricious under the Administrative Procedure Act. *See* Compl. (Doc. 1). Helmuth and USCIS filed cross motions for summary judgment. After careful consideration, USCIS's decision denying the petition survives the narrow limits of judicial review under the APA. Accordingly, I grant USCIS's motion for summary judgment and deny Helmuth's cross-motion for summary judgment.

## I.    BACKGROUND

### A. Statutory and Regulatory Framework

Under the Immigration and Nationality Act (INA), a United States citizen may file an application on behalf of an orphaned child adopted abroad.

8 U.S.C. §§ 1154(a)(1)(A)(i), 1101(b)(1)(F)(i). "The application, known as an I-600 petition, requests that the orphaned child be classified as an 'immediate relative' and granted a visa to permanently reside in the United States." *Skalka v. Kelly*, 246 F. Supp. 3d 147, 149 (D.D.C. 2017) (citing 8 U.S.C. § 1154(a)(1)(A)(i)); *see also Blanford v. United States Citizenship & Immigr. Servs.*, 741 F. Supp. 3d 778, 785–86 (N.D. Ind. 2024).

In adjudicating an I-600 petition, USCIS is tasked with determining whether the child qualifies as an "orphan." *See Skalka*, 246 F. Supp. 3d at 150. As relevant here, the INA provides:

> [A] child, under the age of sixteen at the time a petition is filed in his behalf to accord a classification as an immediate relative under [8 U.S.C. § 1151(b)], who is an orphan because of the death or disappearance of, abandonment or desertion by, or separation or loss from, both parents, or for whom the sole or surviving parent is incapable of providing the proper care and has in writing irrevocably released the child for emigration and adoption; who has been adopted abroad by a United States citizen and spouse jointly, or by an unmarried United States citizen who is at least 25 years of age, at least 1 of whom personally saw and observed the child before or during the adoption proceedings . . . .

8 U.S.C. § 1101(b)(1)(F)(i). USCIS's regulations governing adoptions from countries not a party to the Hague Convention dictate that a child is "abandoned" if the birth parent has "willfully forsaken all parental rights, obligations, and claims to the child, as well as all control over and possession of the child, without intending to transfer, or without transferring, these rights to any specific person(s)." 8 C.F.R. § 204.3(b). Relatedly, "[d]esertion by both

2

parents means that the parents have willfully forsaken their child and have refused to carry out their parental rights and obligations and that, as a result, the child has become a ward of a competent authority in accordance with the laws of the foreign-sending country." *Id.*

To apply for a visa, the petitioner submits the I-600 petition to USCIS along with supporting documentation to demonstrate both that he can provide proper care for the child and that the child meets the statutory definition of an orphaned child. *See* 8 C.F.R. § 204.3(a)(1)(i)–(ii). For the latter proposition, supporting documentation includes the "orphan's birth certificate, or if such a certificate is not available, an explanation together with other proof of identity and age," evidence that the child is an orphan, and evidence of a full and final adoption abroad. *See id.* § 204.3(d)(1). In the case of abandonment or desertion, "[p]rimary evidence . . . is a decree from a court or other competent authority unconditionally divesting the parent(s) of all parental rights over the child because of such abandonment . . . [or] desertion." USCIS Policy Manual Vol. 5, Part C, Chapter 7(B)(4), https://www.uscis.gov/policy-manual/volume-5-part-c-chapter-7. "The non-existence or other unavailability of required evidence creates a presumption of ineligibility." 8 C.F.R. § 103.2(b)(2)(i).

Submission of the I–600 petition and accompanying evidence "triggers a consular officer to conduct what is called an I–604 investigation into the veracity of the child being orphaned (i.e., verifying documentation, researching

3

the child's age, hometown, etc.)." *Skalka*, 246 F. Supp. 3d at 150. A consular officer must complete this investigation "in every orphan case," and "[d]epending on the circumstances surrounding the case, the I–604 investigation shall include, but shall not necessarily be limited to, document checks, telephonic checks, interview(s) with the natural parent(s), and/or a field investigation." 8 C.F.R. § 204.3(k)(1). When confronted with a foreign court decree, order, or certificate, an officer "[s]hould consider all evidence regarding the circumstances of the child's eligibility," and may "question the validity of a decree or order for various reasons," including "[l]ack of parental consent to the adoption; [n]o or improper notice of termination of parental rights; [e]vidence of corruption, fraud, or material misrepresentation; [l]ack of due process or appropriate safeguards in the country or jurisdiction issuing the order; or [o]ther credible and probative evidence to question the reliability of the documentation." USCIS Policy Manual Vol. 5, Part C, Ch. 8(C)(2); *see* 8 C.F.R. § 204.3(k)(2) ("The consular officer's adjudication includes all aspects of eligibility for classification as an orphan under section 101(b)(1)(F) of the Act . . . .").

If the consular officer determines the application is "not clearly approvable," he refers it to the USCIS office in the jurisdiction. 8 C.F.R. § 204.3(k)(2). The USCIS office then reviews the findings and makes a final determination on the I–600 petition after providing the parents with notice

and an opportunity to present contrary evidence. *See id.*; 8 C.F.R. § 103.2(b)(11) ("In response to a request for evidence or a notice of intent to deny . . . the applicant or petitioner may: submit a complete response containing all requested information at any time within the period afforded."). Ultimately, "[t]he standard of proof for establishing eligibility for orphan petitions is that of a preponderance of the evidence. The [prospective adoptive parent] meets this standard if the evidence permits a reasonable person to conclude that the claim that the child is an orphan is probably true." USCIS Policy Manual Vol. 5, Part C, Ch. 8(B).

## B. Factual Background

Plaintiff Justin Helmuth and his wife, Drew Helmuth, are United States citizens and residents of Sarasota, Florida, who engaged an accredited adoption service provider to help them adopt a child from Living Fountain Orphanage in Lagos, Nigeria. *See* Joint Statement of Material Facts (JSMF) (Doc. 24) ¶¶ 1–2 (citing Certified Administrative Record (CAR) (Doc. 19-3) at 128, 135, 342, 349)); *see* CAR at 390. In 2021, with the consent of the orphanage's founder, the Helmuths adopted the child and renamed him S-J-H. JSMF ¶¶ 3, 8, 14–15 (citing CAR at 175, 292, 346–47, 369, 375–80). S-J-H was released to the Helmuths for a two-week bonding period, after which the Yaba Magisterial District Court "finalized the child's adoption, conferring legal custody to the Helmuths." *Id.* ¶¶ 19–20 (citing CAR at 292, 377–80).

### 1. First I-600 Petition

The Helmuths filed their first Form I-600 petition with USCIS on November 4, 2021. *Id.* ¶¶ 4, 22; *see* CAR at 340–56. The petition represented that S-J-H was an orphan because "he . . . has no parents due to the death or disappearance of, abandonment or desertion by, or separation or loss from both parents." CAR at 346. Just over a month later, USCIS issued a Request for Evidence (RFE), requesting (among other things) a police report referenced in the original submission and the "Orphanage Intake Report for the child." *Id.* at 336. As relevant here, the Helmuths submitted (1) a Nigerian Police Incident Report Form, dated September 5, 2019, (2) a Lagos State Government Medical report regarding S.J.H., dated January 28, 2022, and (3) Living Fountain Orphanage's "Introduction of [S-J-H] 2 Years Old," dated August 25, 2021. JSMF ¶ 28; CAR at 326, 329–34.

On May 17, 2022, the Fraud Prevention Manager at the U.S. Consulate General in Lagos, Nigeria, submitted to USCIS a Form I-604 and accompanying memorandum concluding that the Helmuths "failed to satisfy their burden that the child is an orphan under any of the sub definitions in [the INA]." CAR at 322–25; JSMF ¶¶ 29–30. The memorandum first explained that, "though the child was alleged to have been abandoned at a maternity home, no government officials attempted to visit the maternity home until 19 months after the initial [police] report." JSMF ¶ 31 (citing CAR at 323).

6

Additionally, the memorandum "noted an absence of information concerning investigation into claims that the owner of the maternity home had stolen the baby," that "the date of birth on [S-J-H's] birth certificate . . . was after the date on which [he] was allegedly first encountered," that "there was a 13-day timeframe during which it is unclear where the child resided," and finally "that the maternity home no longer existed and . . . may never have." *Id.* ¶¶ 31–35 (citing CAR at 323).

On July 26, 2022, USCIS issued a Notice of Intent to Deny (NOID) the Helmuths' I-600 petition. *Id.* ¶ 41. In response, the Helmuths submitted additional documentation, including "Lagos State Magistrate Court documentation, photographs, letters, affidavits, the transcript of an interview with the founder of Living Fountain Orphanage, and a police report." *Id.* ¶ 45 (citing CAR at 286–312). Among other credibility concerns with the later-submitted evidence, USCIS found it not "plausible that had this information been available and valid prior to issuance of the NOID that it would not have been submitted at the time the Form I-600 was filed or at an earlier time." CAR at 42. USCIS ultimately denied the I-600 petition for failure to demonstrate that S-J-H satisfied the INA's definition of an "orphan" under any sub-definition, including abandonment or desertion. JSMF ¶ 46; CAR at 37–43.

### 2. Second I-600 Petition

On May 3, 2023, the Helmuths filed a second Form I-600 petition to classify S-J-H as an immediate relative and submitted additional documentation not previously provided to USCIS. JSMF ¶¶ 47, 49; *see* CAR at 126–42. Again, the petition represented that S-J-H was an orphan because "he . . . has no parents due to the death or disappearance of, abandonment or desertion by, or separation or loss from both parents." CAR at 132; *see id.* at 24 (arguing that "the child was left at a clinic by an unknown person, and no one claimed the child for nearly five years. This child was abandoned.").

On May 10, 2024, the Fraud Prevention Manager at the U.S. Consulate General submitted a Form I-604 and accompanying memorandum finding that the Helmuths' additional evidence, when considered alongside the previous evidence, failed to show that S-J-H was an orphan under any of the INA's sub-definitions. *See* CAR at 10; *id.* at 11 ("The facts cited by the Consulate in our initial NCA memo hold."). Ultimately, "[k]nowing the amount of human trafficking and child buying that occurs in the area where the child allegedly originated, and thus the distinct possibility that the child may have originated from one of these rings," the consular officer wrote that he could not in "good

conscience approve the I-604 without sufficient credible evidence to support the child's orphan status under the INA."[1] *Id.* at 12.

On July 16, 2024, USCIS issued another NOID, listing the over fifty pieces of documentary evidence submitted and explaining the bases for the intended denial. *See* CAR at 117–25. Specifically, there was insufficient evidence that S-J-H was abandoned. *See id.* at 121–22. On that score, a September 3, 2019 police report "states the child was reportedly abandoned at a maternity home in Lagos on August 25, 2019," but no records confirm the birth mother's name or identity, and "[n]o government officials attempted to visit the maternity home until 19 (nineteen) months after the initial report." *Id.* at 121. Further, the police report lists "an incident that occurred on August 25, 2019, and states that the action taken was a 'Petition on official corruption and unlawful detention and threat to life was approved and referred to Anti-Human trafficking D10 Section for further Investigation and report.'" *Id.* But the Helmuths "provided no follow-up information to this incident report," and thus "[t]here is a question as to whether the child was kidnapped or abducted."

---

[1] The consular officer's discussion accords with the State Department's advice to "prospective adoptive parents to reconsider intercountry adoptions from Nigeria" due to "concerns about the systemic fraud and lack of oversight in the adoption processes in Nigeria." U.S. Department of State, *Intercountry Adoption Notice* (Mar. 13, 2024), https://travel.state.gov/content/travel/en/News/Intercountry-Adoption-News/the-department-of-state-continues-to-advise-prospective-adoptive.html [https://perma.cc/DF4P-FV9Z]. Notably, USCIS denied over seventy percent of Nigerian Form I-600 petitions in 2023. *See id.*

*Id.* Further, "[i]t is unclear who decided on the date of birth for the child or how the stated date of birth could be possible since the listed date of birth on the birth certificate and the Ministry paperwork . . . is over a week after the child was first encountered on August 28, 2019." *Id.* Finally, "[i]t is also unclear where the child was between September 3, 2019, when the police report was taken, and September 16, 2019, when the Living Fountain Orphanage received the child from the Ministry." *Id.*

Likewise, the NOID concluded that S-J-H did "not meet the definition of orphan by any other sub definition of orphan," including desertion, disappearance, or loss from both parents. *Id.* at 122. To satisfy the definition of desertion in particular, the notice advised the Helmuths to "submit[] evidence that the child's natural parents have deserted the child; meaning that the parent(s) have willfully forsaken the child and have refused to carry out normal parental rights and obligations, and as a result, the child has become a ward of a competent authority in accordance with the laws of the foreign-sending country." *Id.*

Although the Helmuths submitted additional documentation in response to the NOID, USCIS denied the second I-600 petition on February 4, 2025. JSMF ¶ 56; CAR at 1–9. USCIS's decision listed all pieces of documentary evidence submitted by the Helmuths but again concluded that there was "insufficient evidence that the child meets the abandonment definition of

10

orphan, or is an orphan by any of the other sub definitions of orphan as defined by INA [§] 101(b)(1)(F)(i)." CAR at 5. Raising concerns over inconsistent or absent pieces of evidence, USCIS explained that "the origin story presented is not credible" and the agency therefore "cannot determine the true origins, age, or identity of the child," or the child's parents. *See id.* at 6–8. Due to USCIS's denial of the visa petition, "S-J-H continues to reside at the Living Fountain Orphanage in Lagos, Nigeria." JSMF ¶ 21; CAR at 348.

Justin Helmuth filed the present action alleging that USCIS's final decision is arbitrary and capricious in violation of the APA. Compl. ¶¶ 106–128. Helmuth asks this Court to hold the decision unlawful, set it aside, and "[d]eclar[e S-J-H] an orphan and [Helmuth's] immediate relative under the [INA]." *See id.* at 20 (Prayer for Relief). The government moves for summary judgment on Helmuth's APA claims, U.S. MSJ (Doc. 23), and Helmuth responds in opposition, Helmuth Resp. (Doc. 26). Helmuth also moves for summary judgment on his APA claims, Helmuth MSJ (Doc. 25), and the government responds, U.S. Resp. (Doc. 27).

## II.   LEGAL STANDARD

Challenges to agency action under the APA are properly adjudicated on cross motions for summary judgment. *See Fla. Fruit & Vegetable Ass'n v. Brock*, 771 F.2d 1455, 1459 (11th Cir. 1985) ("The summary judgment procedure is particularly appropriate in cases in which the court is asked to

11

review . . . a decision of a federal administrative agency."). Ordinarily, Federal Rule of Civil Procedure 56 governs review of a motion for summary judgment. But "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal," and "[t]he 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). Thus, the substantive standard in Rule 56—whether there is a genuine dispute as to any material fact—does not apply here. *See Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014), *aff'd sub nom. Fulbright v. Murphy*, 650 F. App'x 3 (D.C. Cir. 2016) (per curiam). Instead, "[s]ummary judgment is the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *See CS–360, LLC v. U.S. Dep't of Veterans Affairs*, 101 F. Supp. 3d 29, 32 (D.D.C. 2015) (citation modified).

Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In reaching its determination, "a court reviews legal issues de novo, including by applying its 'independent judgment' to statutory-interpretation questions." *Lopez-Martinez v. U.S. Att'y Gen.*, 149 F.4th 1202, 1207 (11th Cir. 2025) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391–92, 412 (2024)). The challenger to agency action ultimately carries the

"heavy burden" to show that such action was arbitrary and capricious. *Legal Env't Assistance Found., Inc. v. EPA*, 276 F.3d 1253, 1265 (11th Cir. 2001).

## III.   ANALYSIS

The parties' cross-motions for summary judgment require me to determine whether USCIS's decision denying Helmuth's second petition to classify S-J-H as an immediate relative was arbitrary and capricious or otherwise unlawful under the APA.

Judicial review under the APA is "narrow" and deferential. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citation modified). The Court may not "substitute its judgment for that of the agency." *Id.* Rather, "[a]n agency's decision will not be overturned as long as the agency examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Ga. Dep't of Educ. v. U.S. Dep't of Educ.*, 883 F.3d 1311, 1314 (11th Cir. 2018) (citation modified). In doing so, "it is well established that the [agency] need not address specifically each claim the petitioner made or each piece of evidence the petitioner presented." *Indrawati v. U.S. Att'y Gen.*, 779 F.3d 1284, 1302 (11th Cir. 2015) (citation modified). But while courts must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," they "may not supply a reasoned basis for the agency's action that the agency itself has

13

not given." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Helmuth brings two claims challenging USCIS's decision as arbitrary and capricious. First, Helmuth contends that "USCIS failed to consider the [Nigerian] Magistrate Court's decision to identify and declare S-H- a 'ward of the state' in accordance with Section 1 of the Child's Rights Law of Lagos State," which he says constitutes primary evidence that S-J-H was deserted under USCIS's own policies. Compl. ¶¶ 114–19. By failing to do so, Helmuth says USCIS did not consider whether S-J-H was deserted. *See* Helmuth Resp. at 3–4. Second, Helmuth asserts that USCIS's decision impermissibly "collaterally attacked the [Nigerian] Magistrate Court's adoption order which found S-H- a ward of the state *sub silentio*." Compl. ¶ 125. In moving for summary judgment, USCIS counters that the agency "properly considered all evidence" and "did not discard inconvenient facts or collaterally attack the validity of the Nigerian adoption decree." U.S. MSJ at 1. I address each claim in turn.

### A. USCIS did not fail to consider evidence of a Nigerian court order deeming S-J-H a ward of the state

At the core, Helmuth's first challenge concerns a purported Nigerian Magistrate Court order finding that S-J-H was a "ward of the state," and USCIS's alleged failure to consider or defer to that finding. According to

14

Helmuth, "S-J-H was 'declared a ward of the State by a Court order issued by the Magistrate Court, Ebute Metta, Lagos on 9th October, 2019, since his birth family could not be identified.'" Helmuth MSJ at 12 (quoting CAR at 96) (citation modified). Helmuth argues that per USCIS's own policy manual, the court order constitutes "[p]rimary evidence of . . . desertion" that USCIS arbitrarily failed to consider. *Id.* at 13 (quoting USCIS Policy Manual Vol. 5, Part C, Chapter 7(B)(4)). In response, USCIS identifies two flaws in Helmuth's position, one factual and one legal.

### i.   USCIS permissibly discredited evidence related to the Nigerian Magistrate Court's care order

As a factual matter, "USCIS does not dispute that Plaintiff legally adopted S-J-H- in accordance with Nigerian law," U.S. MSJ at 11, but instead asserts that "there is no court order making S-J-H- a ward of the state," U.S. Resp. at 3, *see also id.* at 5 & n.1. For that reason, USCIS argues that it fairly "considered an abundance of evidence," including the court and other government records, and reasonably discredited certain evidence. U.S. MSJ at 19. I agree.

USCIS first explains that most of Helmuth's record citations refer to external, third-party statements concerning the court order, not the order itself. Start with Helmuth's principal citation to the CAR at pages 92–97, 224, and 304. *See* Helmuth MSJ at 12, 16. As USCIS correctly details, these

15

citations refer to the "unsworn statement given by Lady Beth Obieri," the founder of Living Fountain Orphanage, in September 2022. U.S. Resp. at 5 n.1. In its original NOID, USCIS explained that it discredited Obieri's statement because it was "dated after the issuance of the NOID," and thus did not provide contemporaneous evidence. *See* CAR at 42; *see also* CAR at 3 (listing Obieri's statement as evidence considered in issuing final decision). Thus, even absent explicit discussion, the record reflects that USCIS considered this evidence.

Next, Helmuth also relies on a March 2023 affidavit from Adetutu Ipaye, an employee in the Ministry of Youth and Social Development, which states "[t]hat the child has become a ward of the State as provided for under relevant laws concerning children in Lagos State," CAR at 203. USCIS suggests that Ipaye's statement is not equivalent to a court order, nor should it be credited because it contains factual inaccuracies regarding S-J-H's "health status." *See* U.S. Reply at 5–7 (Doc. 28) (explaining that, despite Ipaye's statement, the record "lacks an order from the Magistrate Court declaring that S-J-H- is a ward of the state."). And although USCIS's denial order did not mention Ipaye's affidavit regarding whether S-J-H was a ward of the state, USCIS ultimately found the affidavit not credible to establish S-J-H's whereabouts between the dates of September 3 and September 10, 2019. *See* CAR at 7 ("Ms. Ipaye does not work for the police" and "[t]here is no direct evidence from the police that the child was in their custody for a week or that they are even

16

equipped to house and care for a newborn infant."). As with Obieri's statement, I cannot reweigh the evidence to undermine USCIS's credibility determination about Ipaye's affidavit, which does not "constitute a foreign court proceeding, decree, order, finding, or judgment that would be entitled to any deference under USCIS' Policy Manual or international law." *Muozoba v. Jaddou*, No. 1:23-CV-1112 (GTS/MJK), 2024 WL 3968900, at \*6 (N.D.N.Y. Aug. 28, 2024).

So far as I can tell, the only documents that match Helmuth's description of this specific Magistrate Court order are an unsigned family court "Care Order" between the "[Ministry of Youth and Social Development]" and the child, and a handwritten note signed by "C.M Admin" extending the care order multiple times. *See* CAR at 243–44. The orders do not explicitly state that S-J-H is a ward of any competent authority, nor does Helmuth explain how these two documents establish S-J-H's abandonment or desertion by his birth parents.[2] *See id.* at 243. And despite Helmuth's contention that USCIS "never offered a reasoned explanation for why this important aspect of the case was not investigated," Helmuth Reply at 4 (Doc. 29), USCIS's decision explicitly references the care order, noting that it was "unsigned, with an attached

---

[2] Similarly, the August 2021 Nigerian Magistrate Court order declaring the Helmuths "the Legal Parents of [S-J-H]" did not explicitly make a finding that S-J-H had been designated as a ward of the state, and that order does not mention his birth parents at all. *See* CAR at 246–249; *see also* U.S. MSJ at 15.

handwritten document with additional dates written for the Care Order and signed by C.M. Admin," CAR at 1. Likewise, USCIS's earlier denial explained that the care order's "lack of signatures, lack of court letterhead, confused pronoun reference all point to the lack of credibility of the documents and the purported evidence included within them." CAR at 41–42. USCIS permissibly evaluated this evidence. *See Anameze v. Jaddou*, No. 1:24-CV-192 (MAD/PJE), 2025 WL 447742, at *15 (N.D.N.Y. Feb. 10, 2025) (explaining that USCIS reasonably considered deficiencies in a similar Nigerian magistrate court order). Arbitrary and capricious review does not permit me to reweigh these determinations, which appear to align with USCIS's policy statements.[3] *See* USCIS Policy Manual Vol. 5, Part C, Ch. 8(C)(2) (permitting an official's consideration of "credible and probative evidence to question the reliability of the [court] documentation"). In sum, USCIS's decision reflects that the agency considered court documents purporting to show S-J-H's designation as a ward of the state and permissibly found the documents not to be credible.

---

[3] Of course, "agency interpretations contained in policy statements, manuals, and enforcement guidelines are not entitled to the force of law." *United States v. R&F Props. of Lake County, Inc.*, 433 F.3d 1349, 1357 (11th Cir. 2005) (citing *Christensen v. Harris County*, 529 U.S. 576, 587 (2000)). But an agency's operation in accordance with its own policies is relevant to whether it acted arbitrarily and capriciously. *See Patel v. U.S. Att'y Gen.*, 971 F.3d 1258, 1268 (11th Cir. 2020) (en banc) ("If an agency announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed," an irrational departure from that policy "could constitute action that must be overturned" (citation modified)).

18

### ii. USCIS did not fail to consider relevant evidence of whether S-J-H was an orphan by desertion

As for the legal relevance of the Nigerian court orders, USCIS contends that even if a competent authority found that S-J-H was "a ward of the state," that alone would be insufficient to conclude that S-J-H's parents deserted him because the INA's definition also requires the parents' refusal to carry out their rights and obligations. *See* U.S. MSJ at 9–11, 14; U.S. Resp. at 5–6. So, USCIS says it did not need to address the orders in detail. Helmuth pivots in response, claiming that USCIS failed to adequately address desertion because "a local authority – and not a foreign court – can declare a child to be a ward of the state." Helmuth Resp. at 8. Even so, the record reflects that USCIS considered this issue and the evidence to the extent it was relevant.

Although the INA does not specifically define either "abandonment" or "desertion," USCIS's regulations purport to do so.[4] On the latter term,

---

[4] Neither party discusses whether *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), impacts how I should assess the regulations' definition of terms left undefined in the INA, namely "abandonment" and "desertion." Absent any argument by Helmuth either that the INA is ambiguous or that USCIS's definitions do not accord with its text, I proceed on the view that Section 204.3(b)'s sub-definitions are consistent with the meaning of "orphan" in the INA. *See* 8 U.S.C. § 1101(b)(1)(F)(i). And I observe that the regulatory definitions broadly track the terms' ordinary meanings. *See Abandon*, OXFORD ENGLISH DICTIONARY, https://doi.org/10.1093/OED/6133739204 ("To give up (a thing or person) to the control or discretion of another; to surrender or relinquish completely to another person or agent."); *Desert*, OXFORD ENGLISH DICTIONARY, https://doi.org/10.1093/OED/1049493802 ("To forsake (a person, institution, cause, etc., having moral or legal claims upon one)").

"[d]esertion by both parents means that the parents have willfully forsaken their child and have refused to carry out their parental rights and obligations and that, *as a result*, the child has become a ward of a competent authority in accordance with the laws of the foreign-sending country." 8 C.F.R. § 204.3(b) (emphasis added); *see* CAR at 11 (using this same definition). A "[c]ompetent authority means a court or governmental agency of a foreign-sending country having jurisdiction and authority to make decisions in matters of child welfare, including adoption." 8 C.F.R. § 204.3(b). USCIS's policy manual repeats the above formulation but adds that "[d]esertion differs from abandonment in that the parents have not taken steps to divest themselves of parental duties, but the parents' inaction has caused a local authority to step in to assume custody of the child." USCIS Policy Manual Vol. 5, Part C, Chapter 4(B)(2).

While I agree with Helmuth that a court order need not explicitly designate S-J-H a ward of a competent authority to suggest that "a local authority . . . stepp[ed] in to assume custody of the child," the critical factor is *why* the authority intervened in the first place. At bottom, then, Helmuth is incorrect that, "[u]nlike abandonment, desertion does not require proof that the parents have willfully forsaken their rights to the child." Helmuth MSJ at 5; *see* CAR at 7 ("An element of abandonment, disappearance, and desertion requires that the birth parent has 'willfully' forsaken parental rights."). These two orphan sub-definitions hinge on the child's parents' conduct and require

20

that the parents willfully gave up their parental rights either by action or inaction. In either case, that a competent authority assumed control of the child can rarely be dispositive of the statutory inquiry absent evidence of the parents' "willful" decision. For this reason, Helmuth's argument that USCIS did not consider "desertion," or that it only attempts to do so post-hoc, is misguided.

To be sure, USCIS's denial decision focuses on why the evidence was insufficient to establish "that the child meets the abandonment definition of an orphan." CAR at 5. That makes sense, given that Helmuth's primary argument in support of the I-600 petition was that "[t]his child was abandoned." *Id.* at 24; *see generally id.* at 17–25 (declining to discuss desertion in response to the NOID). But USCIS also concluded that the evidence did not show that S-J-H was "an orphan by any of the other sub definitions of orphan," including by desertion. As USCIS argues, its decision "explained that the evidence submitted painted an unclear picture as to the child's true identity and the circumstances surrounding his birth." U.S. MSJ at 20. Those circumstances are equally relevant to desertion.

For example, no evidence confirmed S-J-H's whereabouts for the seven-day period between the September 3, 2019 police report and S-J-H's arrival at his first orphanage. *See* CAR at 7. And USCIS explained that S-J-H's birth certificate, which was issued by the Nigerian government in 2021, listed a

21

birthdate seven days after the date when police were first contacted concerning his alleged abandonment. *See id.* at 5–6, 185, 205. The Nigerian Population Commission was unable to amend the birth certificate after the fact because "no qualified informants or credible persons who could narrate the true facts of his birth have been presented . . . ." *Id.* at 6, 181. And questions remained regarding S-J-H's birth mother and the maternity clinic that was shut down in 2019 due to allegations of child trafficking. *Id.* at 7; *see id.* at 8 ("[T]he State Health Agency has no record of any Floridec maternity clinic, and the actual Flofidel maternity clinic was closed due to allegations of child trafficking."). Notably, "[t]here is no name for the birth mother or the child listed in the police incident report form, dated September 3, 2019," and "[n]o records were provided from the maternity clinic or anyone who worked there who would have had firsthand knowledge of the alleged abandonment." *Id.* at 6; *see id.* at 70–72, 205. The September 3, 2019 police report "records a statement by the husband of the purported owner of the maternity home that his wife was accused of stealing the baby by some unknown people," but no details were provided regarding any follow-up investigation. *See id.* at 6, 205.

Further, an October 5, 2021 report from the Helmuths' adoption service provider, Morgan Hill Children Foundation, suggests that, per a Nigerian State CID report, "the woman carrying the baby on August 26[, 2019] . . . was taking the baby to another hospital and that she was arrested along with the

22

owner of the Floridec maternity home." *Id.* at 6. But USCIS received no "contemporaneous evidence of the arrest or interrogation of" either woman, nor did the later police report mention the arrests. Ultimately, USCIS concluded that "[t]here is a question as to whether the child was kidnapped or abducted," an issue that "directly contradicts a presumption that the birth parent willfully has forsaken parental obligations and rights," as necessary for Helmuth to establish that S-J-H was either abandoned *or deserted. See id.* at 7.

So far as Helmuth addresses the record on this point, he contests its relevance because "[t]he definition of an orphan does not require proof of the [child's] 'origin story.'" Helmuth Resp. at 12. In other words, in "speculating" about the facts of S-J-H's purported abandonment, Helmuth falls back into his core argument that "USCIS entirely failed to appreciate that the Nigerian government had made the child a ward of the state, which rendered [his] parents' identity and actions . . . no longer required to prove he was an orphan." *Id.*; *see* Helmuth Reply at 4 (arguing that the Helmuths "did present evidence that a local authority had stepped in to assume custody of S-J-H and declare him a ward of the state"). Helmuth relies on *Blanford v. USCIS* for the proposition that "[n]othing in either the United States Code or the Code of Federal Regulations requires USCIS to verify, or Plaintiff to prove, the children's age or place of birth." 741 F. Supp. 3d at 789. That is true but incomplete. As *Blanford* "concede[d]," the "age and place of birth could be

relevant in determining the identity [of a child]," particularly when kidnapping or trafficking concerns exists. *Id.* But unlike *Blanford*, where evidence of the mother's identity was "so overwhelming," *id.*, the circumstances of S-J-H's "origin story" here directly relate to whether his birth mother (or father, for that matter) had "willfully forsaken [her] child and [had] refused to carry out their parental rights and obligations." 8 C.F.R. § 204.3(b).

Absent the threshold finding, whether a Nigerian court had "reasonable grounds to believe S-J-H- was in need of care, protection, or control," *see* Helmuth Resp. at 13, is not enough to render him an orphan under the INA. *See Nwankwere v. Jaddou*, No. 1:22-CV-01212-SKO, 2023 WL 5835785, at *11 (E.D. Cal. Sept. 8, 2023) (finding that "USCIS repeatedly highlighted the inconsistencies in the evidence as to the child's identity and its concerns regarding the legitimacy of the child's claims origins," notwithstanding a Nigerian government ministry's determination "that the child was considered abandoned, orphaned, and qualified to be adopted"). To the extent that USCIS declined to engage with the care or adoption orders, USCIS's decision was not arbitrary and capricious in the light of countervailing evidence that S-J-H's birth parents did not willfully forsake him.

24

## B. USCIS's decision is not an impermissible collateral attack on the judgment of a Nigerian court

In a similar line of attack to the first, Helmuth asserts that USCIS's "failure to consider and examine the significance that S-J-H- was declared a ward of the state constitutes an impermissible attack on a foreign judgment." Helmuth MSJ at 14; *see* Compl. ¶¶ 120–28. According to Helmuth, under international law, "a final judgment of a court of a foreign state . . . confirming the status of a person . . . is entitled to recognition in courts of the United States." Helmuth MSJ at 14 (quoting Restatement (Third) of Foreign Relations Law, § 481 (1987)). USCIS counters that "the validity of the Nigerian court judgment is not at issue here," only whether Helmuth provided sufficient evidence to satisfy that S-J-H was an orphan under the INA. U.S. MSJ at 24–25. Because neither foreign court order resolves the definitional question, I agree.

The principal dispute here regards the preclusive effect of multiple Nigerian court orders, beginning with the October 9, 2019 care order. Repeatedly, Helmuth posits that "competent authorities had pursued a care order for S-J-H- and a foreign court declared the child a ward of the state." Helmuth MSJ at 15; Helmuth Reply at 4 ("[A] local authority had stepped in to assume custody of S-J-H- and make him a ward of the state."). But as USCIS notes, this initial, unsigned care order, did not expressly make such a finding.

25

*See* U.S. MSJ at 15–16; U.S. Reply at 5. Apparently conceding as much, Helmuth responds that because "the Court issued an order placing the child under the supervision of an appropriate authority . . . by operation of [Nigerian] law S-J-H- became a ward of the state."[5] Helmuth Resp. at 13.

As an initial matter, Helmuth's position is doubtful because Nigerian law distinguishes between care orders and wardship orders. As relevant here, Nigeria's Child's Rights Laws outline several scenarios that authorize a police officer to "bring a child before the Court," including if the child "is an orphan or is deserted by relatives." *See* Child's Rights Laws, § 44(1)(a) (Doc. 25-1). In certain circumstances, a Nigerian court may issue a care or supervision order placing the child "in the care of a designated authorised person" or "under the supervision of a designated appropriate authority or supervision officer" if "the care given to the child . . . is not what a parent would reasonably be expected to give to the child," or "the child is beyond parental control." *Id.* § 47(1)(a)–(b), (2)(a)–(b). "Where a care order is granted with respect to a child, it will be the duty of the State Government and the appropriate authority designated by the order to receive the child into its care while the order remains in force." *Id.*

---

[5] To the extent that Helmuth asks this Court to consider foreign law, he has given sufficient notice as required by Federal Rule of Civil Procedure 44.1. "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." FED. R. CIV. P. 44.1. I thus consider the Nigerian statutes attached to Helmuth's motion for summary judgment. *See* (Doc. 25-1).

26

§ 49(1). During that time, however, the "State Government or an appropriate authority" must "allow the child reasonable contact with . . . the parents of the child," *id.* § 50(1)(a), suggesting that the child's parents need not have deserted or abandoned him as understood within the meaning of the INA.

Additionally, the wardship proceedings Helmuth references appear to be separate proceedings altogether, with mutually exclusive orders. *See* Helmuth MSJ at 14–16. A different Child's Rights Laws provision states that "[w]here an application is made for an order in respect of a child, the child becomes a ward of court on the making of the order." Child's Rights Laws, § 86(2). In turn, "[w]here it appears to the Court that there are exceptional circumstances making it impracticable for a ward of court to be . . . under the care of either of the ward's parents . . . the Court may . . . make an order committing the care of the ward to an appropriate authority." *Id.* § 88(1). But even once a wardship is ordered by the court, "[t]he drafting of a care order with respect to a child who is . . . a ward of court, brings that wardship to an end." *Id.* § 49(10)(b). Helmuth does not reconcile these differences, nor does he point to other record evidence of wardship proceedings related to S-J-H. *See* U.S. Resp. at 5 n.1 (explaining that "there was no application made for wardship proceedings"). Ultimately, and as discussed above, S-J-H's wardship alone remains insufficient to satisfy all parts of the "abandonment" or "desertion" definitions.

27

Similar limitations apply to the Nigerian Family Court's adoption order. *See* CAR at 246–249. Again, USCIS does not contest the order's validity, conceding that the U.S. Foreign Affairs Manual (FAM) "makes clear that adoption in a foreign country is governed by the standards and criteria that country establishes," which the federal government must then "generally accept." U.S. MSJ at 10 (citing 9 FAM § 502.3-1(G)(a), (e)). None of USCIS's findings were "contrary to the Nigerian decree" that recognized the Helmuths as S-J-H's adoptive parents under Nigerian law. *See* U.S. MSJ at 25; CAR at 246–49. That September 8, 2021 order—printed on the Magistrate Court's letterhead and signed by the Family Court Chairman and Assessor—declares the Helmuths as S-J-H's legal parents, gives them consent "to take [S-J-H] out of the Court's jurisdiction and out of the Country Nigeria," and attaches certain monitoring conditions to the adoption. *See* CAR at 246–49. Insofar as the adoption order recognizes S-J-H's "status" as the Helmuths' adoptive child under Nigerian law, USCIS's decision does not disturb that recognition.

Instead, USCIS merely determined that, notwithstanding his classification under Nigerian law, S-J-H did not meet the INA's "orphan" definition based on the evidence submitted. Helmuth does not persuade that the Nigerian court's "status" determination overlaps with the federal statutory definition of "orphan" such that accepting it would compel USCIS to decide in his favor. In fact, USCIS's regulations contemplate different types of evidence

28

for each finding. *Compare* 8 C.F.R. § 204.3(d)(1)(iii) ("Evidence that the child is an orphan"), *with id.* § 204.3(d)(1)(iv) ("Evidence of adoption abroad or that the prospective adoptive parents have . . . custody of the orphan for emigration and adoption in accordance with the laws of the foreign-sending country."). Here, "[t]he fact that the Magistrate's Court may have considered evidence . . . that purports to attest to the identity and orphanhood of the child[] before issuing [the] decree[] does not mean that the Magistrate's Court rendered findings on those issues, and [Helmuth] has presented no allegation, evidence, or legal authority to suggest that the Magistrate's Court was required to make such findings to effectuate a valid adoption pursuant to Nigerian law." *Muozoba*, 2024 WL 3968900, at \*6. USCIS's decision did not impermissibly collaterally attack the Nigerian court's adoption decree.

\*      \*      \*

Like other courts that have addressed similar challenges, I recognize "that adopting a child is one of the most selfless acts a person can undertake" and am mindful of "the weight of this case and the impact this decision may have on [Helmuth], his wife, and [S-J-H]." *Anameze*, 2025 WL 447742, at \*16. But I have no lawful authority to deviate from the heavily circumscribed limits of judicial review in this case. Because USCIS's decision denying Helmuth's petition was not arbitrary or capricious, I cannot set it aside.

29

## IV.  CONCLUSION

The following is therefore **ORDERED:**

1.  Defendant United States Citizenship and Immigration Services'

    Motion for Summary Judgment (Doc. 23) is **GRANTED**.

2.  Plaintiff Justin Helmuth's Motion for Summary Judgment (Doc.

    25) is **DENIED**.

3.  The Clerk is directed to enter judgment against Plaintiff and for

    Defendant, and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on April 21, 2026.

Kathryn Kimball Mizelle
United States District Judge